UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

PROFESSIONAL SOLUTIONS INSURANCE COMPANY,

Plaintiff,

v.

THE GROVE LA MESA, INC.; SEAN PATRICK MCDERMOTT; and DAVID HYDE,

Defendants.

DAVID HYDE,

Cross-Complainant,

v.

PROFESSIONAL SOLUTIONS INSURANCE COMPANY; HYBRID PAYROLL, LLC DBA MS. MARY STAFFING; THE GROVE LA MESA, INC.; and SEAN PATRICK MCDERMOTT,

Cross-Defendants.

Case No.: 22-cv-1322-GPC-WVG

**JUDGMENT AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**[ECF No. 54]**

This case arises out of a 2021 state lawsuit filed by David Hyde against The Grove La Mesa, Inc, Sean Patrick McDermott, Hybrid Payroll, LLC, doing business as Ms. Mary Staffing, and Sandra Ledesma for claims arising out of Hyde's termination from The Grove. Plaintiff Professional Solutions Insurance Company ("PSIC") is an insurer that issued a liability policy ("Policy") covering Hybrid Payroll, a professional employer organization ("PEO") for The Grove, against specified employment claims. On September 2, 2022, PSIC filed a declaratory judgment lawsuit against The Grove, McDermott, Ledesma, and Hyde seeking a declaration that the Policy does not cover the Hyde lawsuit. ECF No. 1. On October 20, 2022, Defendant Hyde filed a cross-complaint for declaratory relief. ECF No. 14.

Before the Court is Plaintiff PSIC's motion for summary judgment on all claims asserted in PSIC's Complaint, ECF No. 1, and in Hyde's cross-complaint, ECF No. 14. ECF No. 54. Hyde has filed his response in opposition to PSIC's motion for summary judgment, ECF No. 58; Hybrid Payroll has filed a notice of non-opposition, ECF No. 61; and McDermott and The Grove have not filed any response. PSIC has filed its reply. ECF No. 64. For the reasons set forth below, the Court GRANTS the motion for summary judgment.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. Hyde's State Court Complaint And Proceedings ("Underlying Suit")

In February 2021, Hyde filed a complaint in the San Diego Superior Court for the State of California against McDermott and The Grove for allegations of assault, battery, false imprisonment, and intentional infliction of emotional distress. ECF No. 54-4; *see* ECF No. 58-1 at 21[1] (Undisputed Material Fact ("UMF") 21). In June 2021, Hyde filed a first amended complaint ("FAC") with nine additional causes of action and two additional

---

[1] Page numbers are based on CM/ECF pagination.

defendants: Sandra Ledesma and Hybrid Payroll. ECF No. 14 at 27; *see* ECF No. 58-1 at 21 (UMF 22). The nine additional causes of action implicate the Ralph Act, sexual harassment, conspiracy to violate the Ralph Act, conspiracy to commit sexual harassment, sexual discrimination, the Bane Act, wrongful termination, and negligence. ECF No. 14 at 27. Hybrid Payroll, McDermott, and The Grove are named defendants as to each of the thirteen causes of action in the FAC. ECF No. 14 at 52–61.

The FAC in the Underlying Suit alleges that "McDermott is one of The Grove's owners, its CEO, and works as the daily leader of the enterprise." ECF No. 14 at 33 (FAC ¶ 28). It alleges that Hyde "worked as an employee for The Grove" for a few months in 2020 "as a delivery driver." ECF No. 14 at 31 (FAC ¶ 17). Although Hyde sought employment directly from The Grove without assistance from Hybrid Payroll, ECF No. 58-2 at 2, his paychecks came from Hybrid Payroll, *see, e.g.*, ECF No. 58-4 at 40, 58.

The FAC also alleges that Ledesma is The Grove's employee. *Id.* at 30 (FAC ¶ 8). Hybrid Payroll purportedly is "[a] professional employer organization, or PEO," *id.* at 32 (FAC ¶ 21), that "provide[d] professional employee services including to The Grove" for the relevant time period, *id.* (FAC ¶ 20). Hyde surmised that, "[b]ased on Hybrid's website representations," Hybrid was his, Ledesma's, and McDermott's "record employer, or co-employer with The Grove" for the relevant time period. *Id.* (FAC ¶¶ 23, 24). PSIC is identified in the FAC as having "issued a one-year Employ[ment] Pr[actices] Liability Insurance (EPLI) policy, policy number E9346DMLA200 [("the Policy")], with the named insured identified as [Hybrid Payroll]." *Id.* at 31 (FAC ¶ 11).

The FAC alleges that McDermott and Ledesma made up accusations that Hyde had inappropriately touched at least one female co-worker and that these false accusations are what led to Hyde's termination in June 2020. *Id.* at 34–35 (FAC ¶¶ 33–45). The FAC further alleges that when McDermott formally terminated Hyde, McDermott physically—and without justification—blocked Hyde from leaving the building and premises. *Id.* at

44–49 (FAC ¶¶ 126–82). McDermott allegedly stalked Hyde after the termination incident. *Id.* at 49 (FAC ¶¶ 183–90).

**B. The Grove's Relationship To Hybrid Payroll**

Evidence submitted by Hyde reveals that Hybrid Payroll held itself out as a professional employer organization ("PEO") that took care of insurance matters for employees it staffed to its clients. Its website, for example, explained that a client company "take[s] on the role of managing employee performance and work flow," while Hybrid Payroll "essentially handle[s] the financial and HR aspects of employee management." ECF No. 58-4 at 220. Hybrid Payroll's website stated that it would "deal with payroll, benefits, taxes, insurance, unemployment, worker's compensation, . . . become the employer of record," and "handle compliance concerns, including state and federal tax regulations." *Id.* at 221. A purported June 2019 service agreement between Hybrid Payroll and The Grove[2] also suggests that Hybrid Payroll represented to The Grove that Hybrid Payroll would be a co-employer and would be responsible for securing EPLI for assigned employees. ECF No. 63-4 at 24, 28.

**C. Hybrid Payroll's Insurance Policy**

In March 2020, a representative for Hybrid Payroll completed an application to Lexington Insurance Co. for Employment Practices Liability (EPL) coverage. ECF No. 54-15; ECF No. 58-4 at 34. This application was also submitted to Nexus, PSIC's managing general agent and underwriter.[3] ECF No. 36-2 at 4. In relevant parts, the

---

[2] There are three separate pages with space for a signature from a Hybrid Payroll representative, and yet all are left blank. ECF No. 63-4 at 45–47; *see* ECF No. 58-4 at 4.

[3] Mitchell Terk, Vice President, Head of Claims for Nexus, submitted a declaration in support of PSIC's motion for summary judgment attesting that this application was submitted to Nexus. ECF No. 54-2 at 6. Although Hyde draws attention to the confusion around the exact relationship between Lexington and Nexus and PSIC, *see* ECF No. 58 at 11–14; ECF No. 58-3 at 4, he does not present any countervailing evidence suggesting that

application specified that Hybrid Payroll had seven corporate employees; that 100% of its client companies that lease employees from Hybrid Payroll "lease their entire workforce from" Hybrid Payroll; and that The Grove was one of "three client companies to which [Hybrid Payroll] assign[ed] the greatest number of leased employees." ECF No. 54-15 at 3–4.

In May 2020, AmWINS Brokerage of Illinois Insurance Services, LLC, on behalf of Hybrid Payroll, emailed Nexus requesting EPL insurance. ECF No. 54-2 at 21 ECF No. 54-3 at 2. The email explained that Hybrid Payroll "is a PEO" that wanted to "cut[] out pretty much all coverage on their [insurance] renewal." ECF No. 54-3 at 2. Hybrid Payroll did not want "to cover anything other than the 7 internal employees"; all they needed was "a 1m limit for 10,000, and [they] can exclude all PEO services and staffing services." *Id.*

The Policy became effective later that May.[4] ECF No. 36-2. In order to implement Hybrid's directive to limit coverage to seven internal employees of Hybrid, the Policy provided a Client Company/Staffed Employee Exclusion. *Id.* at 35. This exclusion instructed that "no coverage will be available under the Coverage Section(s) identified above for Loss on account of any Claim brought by or maintained against Client Company

the Court should draw an adverse inference as to the authenticity of the application, *see* ECF No. 58-4 (absence).

[4] Hyde challenges the authenticity of the Policy. *See, e.g.*, ECF No. 58 at 17–18; ECF No. 58-1 at 2 (UMF 1, Hyde's response). Meanwhile, Hyde previously requested that the Court take judicial notice of the Policy because the terms of the Policy purportedly had been incorporated by reference in PSIC's Complaint and were "not reasonably in dispute for purposes of a motion between Hyde and [T]he Grove." ECF No. 36-1 at 2–3 (request for judicial notice). The Court took "judicial notice of insurance policy number E9346DMLA200 between Hybrid [Staffing] and [PSIC]," without limitation to the motion then pending before the Court. ECF No. 41 at 8–9. Hyde has not explained the reasoning for his contradictory positions and has not offered any proof to contradict Mitchell Terk's May 2023 declaration attesting that the Policy found at ECF No. 36-2 "is a true and correct copy of the Policy." ECF No. 64-2 at 2. His objection is DENIED.

or any persons furnished by the Insured to any Client Company." *Id.* **Client Company**[5] is defined as "any person or organization for which the Insured provides staffing services." *Id.*

Hybrid Payroll is the only Named Insured on the Policy and PSIC is the Underwriter. *Id.* at 4. The Policy provided EPL coverage, Third Party Liability coverage, and Workplace Violence coverage. *Id.* at 5–6, 22. The Policy defines "**Insured**" as the Insured Persons and the Organization," *id.* at 26; "**Insured Persons**" include (1) "any . . . Employee[6] . . . of the Organization," or (2) "any Independent Contractor,[7] but only if the Organization agrees in writing to provide indemnification to such Independent Contractor

---

[5] Terms throughout the Policy are written in bold font apparently when they are assigned a specific meaning in the Policy. The Court omits this emphasis when quoting from the Policy and moving papers, except where the Court first defines a term.

[6] **Employee** is defined to mean:

> 1. any natural persons who were, now are or shall be in the regular service of the Organization in the ordinary course of the Organization's business, . . . including any such natural persons who are leased, temporary, part-time or seasonal employees of the Organization;
>
> 2. any independent contractor working for the Organization[;] and
>
> 3. any volunteers or interns working for the Organization;
>
> in their capacity as such;
>
> provided (i) any independent contractor or person who is leased to the Organization shall qualify as an Employee only if the Organization provides indemnification to such leased individual in the same manner as is provided to the Organization's employees.

ECF No. 36-2 at 8.

[7] **Independent Contractor** is defined as "any natural person who is not an Employee and who is working for an Organization in the capacity as an independent contractor pursuant to an express contract or agreement with the Organization which governs the nature of such person's engagement." ECF No. 36-2 at 26.

to the same extent as provided to the Organization's employees," *id.* and "**Organization** means, collectively, the Named Insured and its Subsidiaries,"[8] *id.* at 10.

The Policy instructs that PSIC "shall pay on behalf of the Insureds all Loss for which the Insureds become legally obligated to pay on account of any Employment Practices Claim first made against the Insureds during the Policy Period . . . for Employment Practices Wrongful Act." *Id.* at 22. An **Employment Practices Claim** includes, in relevant parts, "a written demand against any Insured for monetary damages or non-monetary damages (including injunctive) relief, including a written demand for reinstatement, reemployment, or reengagement of an Employee," and "a civil proceeding against any Insured commenced by[9] and which shall be deemed first made upon service upon the Insured of a complaint or similar proceeding." *Id.* at 24. An **Employment Practices Wrongful Act** is defined as

> any actual or alleged:
>
> 1. breach of any express or implied employment contract;
> 2. violation of any law or public policy concerning discrimination in employment whether based upon race, national origin, religion, sex, . . . ;
>
> . . . .
>
> 4. harassment, sexual harassment, or hostile work environment;
>
> . . . .
>
> 6. employment-related libel, slander, defamation, humiliation, invasion of privacy, wrongful entry, false imprisonment, malicious

---

[8] **Subsidiary** is defined narrowly, *see* ECF No. 36-2 at 11, and Hyde does not argue that The Grove was a subsidiary to Hybrid Payroll, *see* ECF No. 58 (absence), such that the Court does not discuss this definition further.

[9] For purposes of this subsection, "**commenced by** is defined as: by or on behalf of any past, present or prospective Employee, in their capacity as such, or . . . an Employment Practices Wrongful Act." ECF No. 36-2 at 24.

> prosecution, workplace bullying or the giving of negative or defamatory statements in connection with an employment reference;
>
> . . . .
>
> 8. wrongful termination of employment, including constructive termination, dismissal or discharge;
>
> . . . .
>
> 12. violation of an individual's civil rights, but only when alleged as part of an Employment Practices Claim for paragraphs 1-12 above . . . .

*Id.* at 24–25.

In addition to Employment Practices Claims, the Policy instructs that PSIC "shall pay on behalf of the Insureds all Loss for which the Insureds become legally obligated to pay on account of any Third Party Claim first made against the Insureds during the Policy Period . . . for a Third Party Wrongful Act." *Id.* at 22. A **Third Party** is "any natural person who is not an Insured Person or an applicant for employment with the Organization or an Outside Entity, including but not limited to customers, vendors and suppliers provided." *Id.* at 27. A **Third Party Claim** is defined, in relevant parts, as "a written demand against any Insured for monetary damages or non-monetary relief . . . which shall be deemed first made upon the Insured's receipt of the demand," and "a civil proceeding against any Insured commenced by and which shall be deemed first made upon the service upon the Insured of a complaint or similar pleading." *Id.* at 28. **Third Party Wrongful Acts** are defined as

> any actual or alleged:
>
> 1. discrimination against a Third Party based on race, national origin, religion, sex, . . . ;
> 2. sexual harassment, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature, against a Third Party; or
> 3. unlawful harassment of a non-sexual nature against a Third Party.

*Id.*

The Policy further covers "all Workplace Violence Expenses incurred by the Organization as a result of all Workplace Violence Incidents," subject to certain exclusions. *Id.* at 22. A "**Workplace Violence Incident** means any unlawful and intentional actual or threatened use of deadly force involving the display of a lethal weapon which occurs in or on the Premises and which did or could reasonably result in the death or bodily injury of any Insured Person." *Id.* at 28. and "**Premises** means all properties and buildings which the Organization regularly occupies in conducting its business," *id.* at 27. **Workplace Violence Expenses** include "reasonable fees and expenses incurred by the Organization . . . to hire:" specific independent personnel "immediately following the Workplace Violence Incident." *Id.* The Workplace Violence Coverage does not hold PSIC liable to make payments for "any Workplace Violence Expenses incurred as a result of any demand, suit or proceeding against any Organization based upon, arising out of, or attributable to a Workplace Violence Incident." *Id.* at 22.

Lastly, there is also a coverage exclusion "for bodily injury, sickness, emotional distress, mental anguish, humiliation, disease or death of any person"; but the exclusion does "not apply to any Loss for employment-related emotional distress, mental anguish or humiliation." *Id.* at 29.

**D. PSIC Denies EPL Coverage For Hyde's Underlying Suit**

In November 2020, via phone and email, representatives from The Grove and Hybrid Payroll discussed the events surrounding Hyde's June 2020 termination. *See* ECF No. 54-5 at 16–18. The Hybrid Payroll representative notified PSIC of this potential EPL claim. ECF No. 54-6 at 3; ECF No. 58-1 at 23 (UMF 32 (Hyde response)); *see* ECF No. 54-5 at 16 (Hybrid Payroll email). In February 2021, representatives from The Grove notified representatives from Hybrid Payroll about Hyde's Underlying Suit; Hybrid Payroll relayed the information to PSIC. ECF No. 54-5 at 13–16 (email exchanges); ECF No. 58-1 at 23

(UMF 31); *see* ECF No. 54-6 (underwriter letter denying coverage). In March 2021, Nexus sent a coverage letter to The Grove and Hybrid Payroll explaining that it did not believe that the Policy covered the loss described in Hyde's original complaint. *See* ECF No. 54-6 (coverage letter); ECF No. 54-5 at 7 (March 2021 email from Nexus attaching coverage letter).

The coverage letter explained that the named insured in the Policy was Hybrid Payroll; the original complaint was not against Hybrid Payroll or its employees; and that even if there was a claim against Hybrid Payroll, the Policy excluded bodily injury claims. ECF No. 54-6 at 3–4.

On March 11, 2021, The Grove's representative challenged Nexus' coverage denial. ECF No. 54-5 at 3–6. The representative argued that Hybrid Payroll "is the PEO for The Grove and its employees" and "is legally the employer of . . . Hyde." *Id.* at 3. He reasoned that the policy plainly covered the underlying suit. *Id.* He also cited extensively to case law concerning an insurer's duty to defend. *Id.* at 3–6.

The Grove's email prompted Nexus' CEO to forward the email to Nexus' Executive Vice President, stating: "Clearly this was not the intention of the policy you issued." ECF No. 58-4 at 172. The Nexus Executive Vice President ("VP") forwarded that email to the AmWINS VP and inquired what was "going on." *Id.* The Nexus VP was the same person who had helped initiate the policy with AmWINS on behalf of Hybrid Payroll in May 2020. *See* ECF No. 54-3 at 2. She stated that "[w]hen [they] wrote this policy – [she] was very clear that [Nexus does not] provide Staffing EPL – coverage is for the direct employees of Hybrid not any client companies. [They] even manuscript an endorsement specifically excluding those." ECF No. 58-4 at 172.

After Hyde amended his complaint in the Underlying Suit, with Hybrid Payroll added as a defendant, a representative for The Grove and McDermott sent Nexus additional tenders of defense and demand for indemnity. ECF No. 54-5 at 2 (email from The Grove);

ECF No. 54-8 (second tender of defense and demand for indemnity); *see also* ECF No. 54-13 (additional demand letter from The Grove).  Nexus and PSIC responded by reaffirming their initial denial of coverage.  ECF No. 54-9; *see also* ECF No. 54-14 (additional Nexus denial of coverage).

Counsel for Hyde also contacted PSIC and Nexus "insisting the Policy affords coverage for the Underlying Suit and making a $1 million policy limit demand."  ECF No. 58-1 at 25 (UMF 38); *see* ECF No. 54-10 (letter from Hyde).  Counsel for Nexus and PSIC responded explaining the reasons for continued denial of coverage and declining to participate in the settlement demand.  ECF No. 58-1 at 25 (UMF 39); ECF No. 54-11 (denial letter).

### E.   Federal Proceedings

In September 2022, PSIC initiated the instant proceedings against The Grove, McDermott, Ledesma, and Hyde.  ECF No. 1.  It seeks declaratory relief adjudicating (1) that "the Policy does not afford coverage for the" claims articulated in the FAC "filed in the Underlying Suit," and (2) that "PSIC has no duty to defend and no duty to indemnify The Grove, McDermott or Ledesma under the Policy with respect to" the Underlying Suit. ECF No. 1 at 12.

In October 2022, Hyde filed a cross-complaint against PSIC, Hybrid Payroll, The Grove, McDermott, and Ledesma.  ECF No. 14.  He "seeks an exact declaration of the extent of coverage as guaranteed by the PSIC policy, with respect to each employee, each entity, and as to each of Hyde's claims as expressed in the state lawsuit."  *Id.* at 18.

Ledesma was dismissed from both PSIC's complaint and Hyde's cross-complaint upon the parties' joint motion.  ECF Nos. 33, 34.

## II.   LEGAL STANDARDS

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and

inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A fact is "material" if it might affect the outcome of the case and a dispute is "genuine" if there is evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  Parties may support their assertion that a fact is or is not disputed by pointing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record. Fed. R. Civ. P. 56(c)(1)(A).  Parties "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

Once the moving party has satisfied its initial burden, the nonmoving party cannot rest on the mere allegations or denials of their pleading but must "go beyond the pleadings and by [their] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp.,* 477 U.S. at 324.  If the nonmoving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In making this determination,

the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001).  The court must not engage in "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts"; these functions are for the trier of fact.  *Anderson*, 477 U.S. at 255.

Under Rule 56(d), when "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present [essential] facts, . . . the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  The Ninth Circuit has interpreted this rule as requiring the requesting party to "show [that]:  (1) it has set forth in affidavit [or declaration] form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (quoting *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008) (discussing Fed. R. Civ. P. 56(f) before 2010 amendment moved provision to subdivision (d) "without substantial change")); *see also Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1091 (9th Cir. 2009) (affirming grant of summary judgment "more than two years after the action was filed and much discovery had been conducted" because there was "no plausible basis to believe that the information sought exist[ed]").  The opposing party has the additional burden of demonstrating diligent pursuit of "its previous discovery opportunities."  *Bank of Am., NT & SA v. PENGWIN*, 175 F.3d 1109, 1118 (9th Cir. 1999); *see also Martinez v. Columbia Sportswear USA Corp.*, 553 Fed. App'x. 760, 761 (9th Cir. 2014) (including party diligence in list of considerations on Rule 56(d) motion).  The Court may properly deny further discovery and consider summary judgment if the party fails to comply with these requirements.  *Fam. Home*, 525 F.3d at 827.

"Summary judgment is an appropriate vehicle to determine coverage under an insurance policy when it appears there is no material issue of fact to be tried and the sole issue before the court is one of law." *First Am. Title Ins. Co. v. XWarehouse Lending Corp.*, 177 Cal. App. 4th 106, 113 (2009) (quoting *Pepper Indus., Inc. v. Homes Ins. Co.*, 67 Cal. App. 3d 1012, 1017 (1977)).

## III. DISCUSSION

PSIC moves for summary judgment on all claims asserted in its Complaint and in Hyde's cross-complaint. ECF No. 54 at 7. PSIC argues that both the terms of the contract and mutual intent of the contracting parties—Hybrid Payroll and PSIC—demonstrate the Policy did not afford coverage for the Underlying Suit. *Id.* at 21–27.

### A. The Policy Does Not Cover The Claims In The Underlying Suit.

Counter-Complainant Hyde contends that Hybrid Payroll, in its capacity as The Grove's PEO, became Hyde's employer of record and that the terms of Hybrid's insurance policy cover Hyde's employment-related claims. PSIC argues that both the Policy terms and intention of the parties demonstrate that the Policy does not cover the claims in the Underlying Suit.

"[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19 (1995). This duty applies even to "groundless, false, or fraudulent" claims, and "is separate from and broader than the insurer's duty to indemnify." *Id.* (quoting *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276 (1966)). However, there is no duty to defend "where there is no possibility of coverage." *Id.* (quoting *Fire Ins. Exch. v. Abbott*, 204 Cal. App. 3d 1012, 1029 (1988)). The insured party has the initial burden to show that an underlying claim falls within the scope of the insurance policy. *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998). Once

that burden is met, "the burden is on the insurer to prove the claim is specifically excluded." *Id.*

California courts follow traditional rules of contract interpretation to determine whether there is a potential for coverage under a particular insurance policy. *Waller*, 11 Cal. 4th at 18. Courts should "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Id.* The "mutual intention of the parties at the time the contract is formed governs [contract] interpretation." *Id.* (quoting *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821 (1990)). If possible, party intent should be inferred "solely from the written provisions of the contract." Absent contradictory meaning or usage given by the contracting parties, "[t]he 'clear and explicit' meaning of [contract] provisions, interpreted in their 'ordinary and popular sense,' . . . controls judicial interpretation." *Id.* (quoting *AIU Insurance*, 51 Cal. 3d at 821). "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." *Id.*

"Before 'even considering [policy] exclusions, a court must examine the coverage provisions to determine whether a claim falls within [the policy terms]." *Id.* at 16 (second alteration in original) (quoting *Hallmark Ins. Co. v. Superior Court*, 201 Cal. App. 3d 1014, 1017 (1988)).

**1. No insured party has met their burden to show that the Underlying Suit falls within the scope of the Policy.**

The insured party has the initial burden to show that an underlying claim falls within the basic scope of insurance coverage. *Aydin Corp.*, 18 Cal. 4th at 1188; *accord Mudpie, Inc. v. Travelers Cas. Ins. Co.*, 15 F.4th 885, 890 (9th Cir. 2021). Hybrid Payroll has filed a notice of non-opposition to PSIC's motion for summary judgment, ECF No. 61, and neither The Grove nor McDermott filed any response to PSIC's motion for summary

judgment.  Because Hyde asserts that he is an insured, he bears the burden to show that the underlying claim falls within the scope of the Policy.

The Policy defines "Insured" as both "Insured Persons and the Organization."  ECF No. 36-2 at 26. Hyde is neither the Named Insured, *see id.* at 4, nor a subsidiary of the Named Insured, and so he does not fall within the definition of "Organization."  *See id.* at 10.  Hyde does not argue that he was an independent contractor,[10] *see* ECF No. 58 (absence), and so the only route left by which he could have been an Insured Person is if he was "a duly elected or appointed director . . . , trustee . . . , governor, Manager, officer, Employee . . . , general counsel, risk manager, controller, advisory director, or member of a duly constituted committee or board of the Organization or their functional equivalent." *See* ECF No. 36-2 at 26.  In relevant part, the Policy defines Employee as "any natural persons who were . . . in the regular service of the Organization in the ordinary course of the Organization's business, . . . and including any such natural persons who are leased, temporary, part-time or seasonal employees of the Organization."  *Id.* at 8.

Hyde argues only that he was a Hybrid Payroll Employee.  ECF No. 58 at 18–19, 30–31.  Hyde engages with the "regular service" requirement of the Employee definition only to argue that the phrase is undefined and thus permits the consideration of extrinsic evidence.[11]  *Id.* at 30.  To support his position that he was a Hybrid Payroll employee, he first points to the four earnings statements he received while working for The Grove which had Hybrid Payroll's name on them.  *Id.* at 18; *see* ECF No. 58-4 at 40, 58, 97, 104 (statements of earnings).  These earnings statements have Hybrid Payroll's name and

---

[10] Nor could he given that to be classified as an Independent Contractor under the Policy he would have been required to have "an express contract or agreement with" Hybrid Payroll.  ECF No. 36-2 at 26.

[11] Hyde does not engage with the "ordinary course of the Organization's business" portion of the definition.  *See* ECF No. 58 (absence).

address on them as well as "TG Dis," presumably for The Grove Dispensary. *E.g.*, ECF No. 58-4 at 40. Hyde next asserts that Hybrid Payroll claimed Hyde as an "employee for tax and payroll purposes," ECF No. 58 at 18, and points to Hyde's "paycheck annual summary," ECF No. 58-4 at 7, which identifies Hybrid Payroll as Hyde's employer, *id.* at 128. He reasons that this aligns with Hybrid Payroll's "website representation to become the employer of record, and its contractual representations to The Grove to become Hyde's co-employer." ECF No. 58 at 18. Finally, he points to assertions by a representative of The Grove that Hybrid Payroll was Hyde's employer. *Id.* (citing ECF No. 58-4 at 173).

PSIC argues that Hyde was not an insured under the Policy. It replies that Hyde's earning statement is evidence only that "Hybrid [Payroll], a PEO, provided payroll services to The Grove." ECF No. 64-1 at 2–3 (UMF 51). It further points to Hyde's admissions in the Underlying Suit in which he admits that he "worked as an employee for The Grove . . . as a delivery driver." ECF No. 14 at 31; ECF No. 54 at 25.

Hyde is correct that the phrase "regular service" is not defined under the Policy. *See* ECF No. 36-2 (absence). However, he is wrong to assert that because it is undefined, the Court must consider extrinsic evidence to determine whether Hyde was Hybrid Payroll's employee. *See Wooddale, Inc. v. Fid. & Deposit Co.*, 378 F.2d 627, 630 (8th Cir. 1967) (explaining similar insurance policy definition is not ambiguous). Rather, the Court considers the plain meaning of the term if possible. *See Waller*, 11 Cal. 4th at 18. An event is "regular" if it is "done or happening frequently" or is "usual." *Pocket Oxford English Dictionary* 759 (Catherine Soanes, ed. 2002). "Service" is defined, in relevant part, as "a period of employment with an organization." *Id.* at 826. Because the definition requires that an employee be in "*regular* service of the Organization," ECF No. 36-2 at 8 (emphasis added), something more is required than just some form of employment. Instead, Hyde must have been providing Hybrid Payroll either frequent or usual services. This is further supported by the requirement that an "Employee" must necessarily "be in

the regular service of the Organization in the *ordinary course* of the Organization's business," *id.* (emphasis added), rather than working for a completely different entity.

Hyde does not point to any evidence suggesting that he was in the "regular service" of Hybrid Payroll. Instead, he acknowledges that he worked for The Grove and through Hybrid Payroll only as a "provider" of The Grove's employment needs. ECF No. 14 at 3. Thus, he is not considered Hybrid Payroll's Employee nor is he considered an Insured Person under the Policy.[12] Because there is no insured party presenting any argument or evidence suggesting that the Underlying Suit falls within the scope of the Policy, the Court concludes that PSIC is entitled to summary judgment on its claims as a matter of law.

Hyde argues that summary judgment is premature and includes a declaration attesting that whether Hyde is Hybrid Payroll's employee is still an outstanding issue. ECF No. 58-3 at 4. Yet, on July 23, 2022, Hyde's counsel sent a letter insisting that the Policy provides coverage for the Underlying Suit. ECF No. 58-1 at 25. Furthermore, Hyde makes no mention of any attempt to diligently pursue a resolution of these outstanding issues during discovery. *See id.* at 2–5 (absence); ECF No. 58-3 at 34 (absence). Nor does he show what additional discovery would permit him to address this issue. Ultimately, Hyde is in the best position to offer evidence that he was in the "regular service" of Hybrid Payroll. His assertion that the motion is untimely is therefore unpersuasive.

---

[12] Whether Hyde can be considered Hybrid Payroll's employee beyond the Policy is not at issue before this Court. *See, e.g.*, *Mathieu v. Norrell Corp.*, 115 Cal. App. 4th 1174, 1184 (2004) ("[T]he purposes of [the Fair Employment and Housing Act ("FEHA")] are promoted if both the staffing agency and its client are treated as the employer, and employees of the client entity are treated as coworkers of employees of the staffing agency, within the meaning of FEHA.").

**2. Even if Hyde had been an Insured Person, the Underlying Suit is plainly excluded by the Policy's Client Company/Staffed Employee Exclusion.**

To the extent that there is a genuine issue as to whether Hyde is a covered Employee, the Client Company/Staffed Employee Exclusion would bar coverage where it instructs that the Policy does not cover any "Claim brought by or maintained against [(1)] Client Company," defined as "any person or organization for which the Insured provides staffing services," or (2) "any persons furnished by the Insured to any Client Company." ECF No. 36-2 at 35. Hyde concedes that The Grove is a Client Company. ECF No. 58 at 26. And even though he argues and presents evidence suggesting that Hybrid Payroll held itself out to The Grove to at least be a co-employer for The Grove's employees, *see* ECF No. 58 at 12, 30–31 (brief); ECF No. 58-4 at 220–21 (Hybrid Payroll's website); ECF No. 63-4 at 24, 28 (Hybrid Payroll's service agreement with The Grove), it is beyond dispute that Hyde would be considered "furnished"[13] to The Grove—as opposed to Hybrid Payroll or any other company—due to Hyde's own allegations that he "worked as a retail employee of The Grove, in conjunction with Hybrid Payroll . . . as a *provider* of The Grove's employment needs," ECF No. 14 at 3 (emphasis added); *see also id.* at 31–32 (describing Hyde's employment with The Grove and explaining that Hybrid Payroll "*provides* professional employee services including to The Grove" (emphasis added)); ECF No. 58 at 27 (Hyde conceding that "Hybrid [Payroll] represented to PSIC that it furnished The Grove's workforce" and that PSIC agreed to such an understanding). Hyde offers only conclusory statements to the contrary. *See, e.g.*, ECF No. 58-1 at 20 (Hyde's response to UMF 20 pointing only to his declaration attesting to him starting work with The Grove

---

[13] To "furnish" means to provide or supply. *Furnish*, POCKET OXFORD ENGLISH DICTIONARY 367 (Catherine Soanes, ed. 2002); *see also* ECF No. 58 at 26.

without going through Hybrid Payroll). Hyde alleges that whether Hybrid Payroll furnished "any personnel to The Grove[] so as to conceivably satisfy the staffed exclusion" is still an outstanding issue, but fails to allege any due diligence in discovery to pursue this question and points only to evidence suggesting that Hybrid Payroll furnished employees to The Grove. *See* ECF No. 58-3 at 3 (citing ECF No. 63-3 at 58 (Hybrid Payroll service agreement discussing "assigned employees") and ECF No. 58-4 at 36 (Hybrid Payroll's insurance application stating that 100% of its client companies' workforce contain leased employees assigned by Hybrid Payroll)). Accordingly, the Client Company/Staffed Employee Exclusion is clear on its face that the Policy does not cover any of Hyde's claims against any of the defendants in the Underlying Suit.

PSIC further argues that the contracting parties' intent to exclude coverage for claims like those in the Underlying Suit can be determined from the May 2020 email from AmWINS on behalf of Hybrid Payroll to Nexus looking for EPL coverage. ECF No. 54 at 21; ECF No. 54-3 at 2. The email explains that Hybrid Payroll is a PEO but that it was "NOT looking to cover anything other than the 7 internal employees"; it wanted to "exclude all PEO services and staffing services." ECF No. 54-3 at 2. PSIC reasons that this email demonstrates that "the mutual intention of Hybrid [Payroll], the named insured, and PSIC, the insurer, was to limit EPL Coverage to those seven Hybrid [Payroll] employees." ECF No. 54 at 21. PSIC asserts that this intent was expressed via the Client Company/Staffed Employee Exclusion which stated that "no coverage will be available under the Coverage Section(s) identified above for Loss on account of any Claim brought by or maintained against Client Company or any persons furnished by the Insured to any Client Company." *Id.* at 22 (quoting ECF No. 36-2 at 35). Because "Client Company" is defined as "any person or organization for which the Insured provides staffing services," ECF No. 36-2 at 35, PSIC reasons that The Grove, as a recipient of Hybrid Payroll's PEO services, constitutes a Client Company and both McDermott and Ledesma were

"employees furnished to a client company." ECF No. 54 at 22. PSIC argues "there is no coverage for this matter under the Policy." *Id.*

Hyde challenges whether the contracting parties truly intended for the Policy to cover "just the 7 in-house employees." ECF No. 58 at 15–16; 29–30. He interprets the email from Nexus' CEO in response to The Grove's March 11, 2021 email as a confession that the "7-employee claim is without merit." *Id.* at 15; *see also id.* at 29–30. His only other challenges to whether the contracting parties intended such narrow coverage is to make an inexact comparison to the insurance policy Hybrid Payroll promised to The Grove for its roughly 40 staffed employees as evidence that the Policy did not make financial sense for Hybrid Payroll, *id.* at 15, 30; *see also* ECF No. 63-3 at 81 (Hybrid Payroll's contract with The Grove briefly summarizing The Grove's EPL insurance selection), and to posit that Hybrid Payroll's representations when contracting with The Grove belies Hybrid Payroll's earlier intention behind the Policy with PSIC, ECF No. 58 at 29.

However, the Court need not consider any extrinsic evidence because the Client Company/Staffed Employee Exclusion sufficiently establishes the contracting parties' intent when forming the Policy and is unambiguous. *See Waller*, 11 Cal. 4th at 18. Even if it did, Hyde's extrinsic evidence concerning the intent of the contracting parties is weak compared to PSIC's evidence demonstrating that when AmWINS applied for EPL coverage on behalf of Hybrid Payroll it was only for the "7 internal employees." *See* ECF No. 54-3 at 2. Indeed, the natural conclusion to draw from the Nexus' CEO email is that The Grove's March 11, 2021 email inaccurately described the Policy, *see* ECF No. 58-4 at 172–74, and Hybrid Payroll's representations to The Grove about its insurance coverage offers only de minimis countervailing evidence to the representations made between Hybrid Payroll and PSIC when arranging the Policy.

### B. Evidentiary Objections

Hyde has presented evidentiary objections within his response to PSIC's separate statement of facts. *E.g.*, ECF No. 58-1 at 2, 15 (objecting for hearsay and lack of authentication, foundation, and personal knowledge). The Court notes the objections. To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence. To the extent that the evidence is not proper, the Court did not consider it.

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS** PSIC's motion for summary judgment as to its complaint and Hyde's cross-complaint in their entirety. The Court concludes that (1) the Policy, No. E9346DMLA200 between PSIC and Hybrid Payroll, does not afford coverage for Hyde's claims as articulated by the First Amended Complaint in the Underlying Suit and (2) PSIC has no duty to defend and no duty to indemnify Hybrid Payroll, The Grove, McDermott, or Ledesma under the Policy with respect to Hyde's claims as articulated by his First Amended Complaint in the Underlying Suit.

**IT IS SO ORDERED.**

Dated: June 12, 2023

Hon. Gonzalo P. Curiel
United States District Judge